ORDER GRANTING MOTION TO DISMISS
JAMES M. GENIA, C.J.
Appellant Dakota Shananaquet, the Natural Mother of the minor who is the subject of this case, filed an appeal of a Tribal Court ruling. After the filing of the appeal, the minor was returned to Shanana-quet. Through her attorney, Shananaquet has filed a motion asking that the Appellate Court dismiss her appeal. The Appellate Court concludes that the motion to dismiss the appeal should be granted because the issues raised in the appeal are now moot.
IT IS SO ORDERED.
Attachment
LITTLE TRAVERSE BAY BANDS OF ODAWA INDIANS TRIBAL COURT
7500 Odawa Circle ~ Harbor Springs, MI 49740 ~ (231) 242-1462
CHILDRENS DIVISION
In the matter of DOB 05/20/94 JCW-005-0899
OPINION
On August 19, 2009, the Honorable Jenny Lee Kronk, Little Traverse Bay Bands (LTBB) of Odawa Indians Associate Tribal Judge, conducted a review hearing in this matter. Present at the hearing were: [redacted], the biological mother Dakota Shananaquet, Presenting Officer Matthew Lesky, Guardian ad litem Shawn Cordes-Osbome, LTBB Social Worker Jeannie Norris, the LTBB Director of Social Services Denneen Smith, foster parent Sandra McSawby, Aunt Cathy and Uncle James Gibson, Aunt Julie Shananaquet, José Negrete, and LTBB Law Enforcement Officer Ryan Roberts.
Findings of Fact
1. Dakota Shananaquet’s Initial Service Plan was presented to the Court on November 10,2008.[1]
2. In the November 10 case service plan, the Caseworker set six *119 goals/objectives for Ms. Shanana-quet that included: obtaining and maintaining employment; obtaining and maintaining appropriate permanent housing including rent, utilities, food and heat; abstaining from drugs and alcohol; participating in family grief counseling; following the initial service plan; and attending Family Service Coordinating Team meetings.
3. Specifically, Goal/Objective Number 1 required that Ms. Shananaquet contact Michigan Works!, fill out at least five applications per week, return phone calls, attend interviews, show up for work on time, and provide to the “social worker employment verification/information. (i.e. pay stub)”
4. This goal was later revised to “Dakota Shananaquet shall obtain a college education.” This objective required Ms. Shananaquet to sign up for classes through NCMC[2], fill out the FAFSA form and other appropriate paperwork, provide the Caseworker with class schedule, attend all classes on time as scheduled, complete and turn in all work, and provide the caseworker with updates and grades in all classes.[3]
5. In the February 18, 2009 Court Report (February Report), the Caseworker reported under Objective 1: “Ms. Shananaquet has made no steps or worked on the objectives for follow through with this goal.” “Ms. Shananaquet did not enroll in school this semester and therefore has not followed through with school or work and this goal.”
6. In the March 24, 2009 Court Report (March Report), the Caseworker indicated for Objective 1 that “In the Service Plan Ms. Shananaquet is to obtain and maintain employment/education for a period of at least six months. On March 23, 2009 Ms. Shananaquet stated she was going to apply for a job at the casino. To date, this worker has not been provided with proof. Dakota also stated she really wants to go to school but not at North Central Michigan College. Ms. Shananaquet also mentioned making jewelry as a source of extra income.”[4]
*120 7. In the May 22, 2009 Court Report (May Report), the Caseworker reported “In the Service Plan Ms. Shananaquet is to obtain and maintain employment/education for a period of at least six months. Ms. Shananaquet has applied for two summer classes through North Central Michigan College. They are English Composition II and Psychology. Dakota is also making and selling jewelry.”
8. The case service plan’s Goal/Objective Number 2 was that “Dakota Shananaquet shall maintain appropriate housing which includes rent, utilities and food.” This objective required that Ms. Shananaquet search for housing, pay first month’s rent and deposit prior to moving in, find appropriate roommates, notify the caseworker of change of address, complete a home study, and provide documentation of the lease agreement, and proof of payment for rent as well as utility bills, such as cable, telephone, heat, electric or propane.
9. In the February Report, the caseworker reported that she spoke with Mr. Negrete who paid the bills and maintained the housing for Dakota and their three children. They are no longer a couple but he was okay for Dakota “and his children to stay at the house now and while he works in Florida. He stated he would be good with Andréa living at the house.”
10. Goal/Objective Number 3 of the case service plan required that “Dakota shall abstain from drugs and alcohol.” This objective required Ms. Shananaquet to com-píete an updated substance abuse assessment and follow recommendations made by the Substance Abuse Department, sign a release for social services to speak with the substance abuse professionals, and submit to random drug and alcohol screens.
11. Also in the February Report, the Caseworker stated that Ms. Shana-naquet had a substance abuse evaluation on January 19, 2009, wherein the evaluator recommended that she participate in outpatient counseling, attend AA meetings and comply with the service plan. On February 4, the Caseworker requested that Dakota begin attendance at AA meetings and she refused.
12. The Caseworker also stated in the February Report that Ms. Shana-naquet had drug screens done on her own at the clinic and submitted to 5 drug screens as requested by Social Services, tested positive on January 2 for morphine, and refused three drug tests. The caseworker concluded that “Ms. Shana-naquet has not been in regular compliance with is goal.”
13. In the March Report, the caseworker stated that “To date, Ms. Shananaquet has not attended any AA meetings.” The case worker reported two clean random drug screens on March 3 and March 23 but on March 20 the Caseworker left two messages for Ms. Shanana-quet to submit to a random drug screen by 5:00 p.m., but she did not contact the Caseworker.
14. In the May Report, the Caseworker indicated that “The worker was *121 instructed to ask Mr. Negrete on April 22, 2009 if he would work on a service plan through the Social Services Program which included conducting random drug screens due to the violation of controlled substance, possession of marijuana charge from February 2009. Mr. Negrete was upset at this request and refused to work with the Social Services Program. He became loud and expressed his negative feelings again later in the meeting.” “Due to Mr. Negrete’s charges not being totally dismissed and his unwillingness to work with the Social Services Program overnight visitations have not occurred. The first day visit started on Mother’s Day between [redacted] and [redacted] biological mother. A day visit was also scheduled for May 17, 2009. Mr. Negrete may not attend these visitations.
15. In the August Report, the Caseworker indicated, “Visitations have been allowed to be centered around Andréa this summer. This worker let Andréa have a lot of say when she wanted to visit with her biological mother during the summer due to Andréa having plans during the summer and her age. Ms. Shana-naquet had also mentioned wanting to be able to visit with Andréa during family functions which occur with short notice. This worker allowed these types of visits to occur as long as Ms. Shananaquet contacted a worker through Social Services to advise them of the family event. An example of a family event includes Aunt Millie Shomin taking everyone out to dinner.”
16. On August 5, 2009, the LTBB Child Welfare Commission passed Resolution 08-04-2009-03 in which it recommended, without discussion, reunification in case number JWC-005-0899 (sic).
Discussion
[redacted] has been a ward of this Court since August 1999 and the Court must do what is in [redacted] best interests. Because of the conflicting and unreliable evidence presented at this hearing, the Court is concerned about Ms. Shananaquet’s compliance with the first three goals of her case service plan regarding employment and/or education, housing and abstinence. The only evidence presented at the hearing was hearsay; hearsay evidence is of little probative value and not always trustworthy and reliable. In addition, some of the evidence was in conflict with evidence presented at previous hearings.

Maintenance of Employment/Education for Six Months

Goal Number 1 of the case service plan is that “Ms. Shananaquet is to obtain and maintain employment/education for a period of at least six months.” In the February Report, the Caseworker wrote that Ms. Shananaquet “has made no steps or worked on objectives to follow through with this goal.” In the March Report, the Caseworker stated that Ms. Shananaquet said she was going to apply for a job at the casino but provided no proof of employment. In the May Report, the Caseworker said that Ms. Shananaquet had signed up for summer classes (but there was no report about the casino job); almost as an afterthought, the Caseworker reported that Ms. Shananaquet was making jewelry for extra income. The information presented at the February, March and May Reports does not indicate that Ms. Shana- *122 naquet has been employed or going to school and in compliance with this goal for six months.
Further, at this hearing there was no official transcript from NCMC entered into the record to show that Ms. Shanana-quet had successfully completed summer classes. Similarly, no pay stubs were offered into the record to verify a job at the casino or receipts for extra money earned by making jewelry. Also, it would be helpful to the Court to receive a statement from the Emmet County Friend of the Court indicating what Dakota has paid with her earnings for child support and/or arrearages in the past six months.[5]

Maintenance of Appropriate Housing for Six Months

The evidence indicates that Mr. Negrete has provided housing since December for Ms. Shananaquet and the three children he fathered with her, even though they are no longer a couple. In the February Report, the Caseworker reported that she had spoken with Mr. Negrete and he indicated it was okay for Ms. Shananaquet and her children, including [redacted], to live in the home then and while he worked in Florida. He has not provided proof of the lease agreement, or proof of payment of rent and utilities. Finally, there has been no update in the past six months of whether he is still working in Florida and whether Mr. Negrete is still in agreement with this living arrangement.

Abstinence from Drugs and Alcohol

Ms. Shananaquet has a lengthy history of substance abuse including a drug felony conviction in 1998, a drunken driving offense, and a diagnosis of alcohol dependency [6] as recently as January 19, 2009. Unfortunately, Dakota has not been totally cooperative with submitting to random drug screens. Indeed, she has refused several requests for drug screens, tested positive in January, and did not submit to a requested drug test as recently as March 20, 2009. In addition, Ms. Shananaquet herself scheduled drug screens at the health clinic with Dr. Samuels. Finally, in the 89 days between the last two hearings, Dakota was only drug-tested five times on week days. There does not appear to be random or weekend drug testing.
In addition, Ms. Shananaquet purports to be living with Mr. Negrete, who had a possession of marijuana drug charge as recently as February and has been uncooperative with the Tribal Social Services, refusing to submit to drug testing. Although it was reported that the drug charges have been dropped against Mr. Negrete, there was no order of dismissal presented to the Court.
Finally, there is no verification beyond a self-report that Dakota has been attending AA and thereby following the recommendations of her substance abuse evaluator.

Visitation

Finally, the Court is concerned about the visitation or lack thereof between [redacted] and [redacted] mother. In the May Report, the caseworker indicated that “Ms. Shananaquet visited for the week during Spring Break. This worker spoke with Carolyn on April 2,2009 and she stated during the visit [redacted] and [redacted] spent one night with Carolyn. Ms. *123 Shananaquet and [redacted] went to a ceremony the weekend of April 10-12. [redacted] had an overnight visit with [redacted] biological mother on Wednesday April 15, 2009.”
“Visitations were suspended after the Emergency Court Hearing held on Thursday April 16, 2009 due to the Social Services program completing an updated background check for Ms. Shananaquet and Mr. Negrete. Ms. Shananaquet had received a ticket for driving without a license on April 13, 2009. Please let it be noted, there were no children in the vehicle at the time. Mr. Negrete had a violation of controlled substance, possession of marijuana charge from February 2009.” It was reported that there was minimal visitation and only one overnight visit because of Mr. Negrete’s recent drug charges.
In the three months since the last hearing, the testimony of the Caseworker was vague but it does not appear to the Court that there has been much visitation between [redacted] and [redacted] mother in the past three months. The Court would like specific information about the frequency and duration (including dates and times) of visitation between the May hearing and the current time.
Pursuant to Section XXI (C)(1)(b) of the Waganakising Odawak Child Protection Statute, the Court shall determine why visitation did not occur or was infrequent. However, there is insufficient evidence in this record to make this determination.
Finally, the Court would like to note that it takes very seriously the recommendation of the Child Welfare Commission. However, because there were no reasons articulated for its recommendation in Resolution 08-04-2009-03, the Court is unable to ascertain if it considered the above factors in making its decision.
Conclusions of Law
Based upon all of the above and the conflicting and unreliable evidence presented at this hearing, the Court cannot conclude that the biological mother has met the goals of her case service plan for a period of at least six months. Even though reunification remains the goal in this case, based upon the evidence at this hearing, the Court cannot return the child to the biological mother’s care at this time.
However, the Court will allow a CONTINUANCE in this matter. Either party may request a hearing when prepared to proceed.
September 11, 2009
/§/ Honorable Jenny Lee Kronk, Associate Tribal Judge

. In the November 10, 2008 court report, the Caseworker stated: "This worker is in the process of completing the Initial Service Plan and visitation schedule for Dakota to follow and will be working with Dakota on this plan for possible reunification purposes. This plan will be implemented by Friday November 21, 2008. This worker will then forward a copy of the Initial Service Plan and Visitation Schedule to LTBB Tribal Court.”

. North Central Michigan College.

. On February 2, 2009, the Court received an Initial Case Service Plan that changed the first objective to "Dakota Shananaquet shall obtain a college education.” There was handwriting on the second objective that Dakota would have a home study done at “Bob’s and Joe’s .... have stuff in Bob’s home .... Bob person Dakota dates” and handwriting next to the third objective that indicated that random drug screens would be "weekly screens at clinic with Dr. Samuels.” There was also handwriting on the initial service plan that Social Services would "need info from Joe re: arrangement. Joe allowing her to stay and he pays bills and Drea okay to come.”

.In the August 12, 2009 Court Report (August Report), the caseworker indicated that "Ms. Shananaquet has shown great strides in progress since February and has been completely following through with her service plan since February (6 months). The Social Services Program required 6 months of compliance with the service plan for reunification purposes and Ms. Shananaquet has met this goal, Ms. Shananaquet has proven to the Social Services Program that she can comply with the case service plan and has for the past 6 months. Ms. Shananaquet has maintained housing, abstained from drugs and alcohol, been enrolled and attended school, has attended grief counseling, AA meetings and attended meetings consistently with this Worker. The program is able to verify that Ms. *120 Shananaquet has done this consistently for 6 months.”

. There is a January 29, 2009 memo in the file from BJ Bailey, Emmet county Friend of the Court Account Manager, which indicated that Dakota Shananaquet was $8,163.20 in arrears for child support.

. Not specified to be in remission.